[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 03-14304

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 21, 2006
THOMAS K. KAHN
CLERK

D.C. Docket No. 01-00983-CV-N-S

THOMAS D. ARTHUR,

Petitioner-Appellant,

versus

RICHARD F. ALLEN,

Respondent-Appellee.

_____

Appeal from the United States District Court for the
Northern District of Alabama

_____

(June 21, 2006)

BEFORE:  BIRCH, BLACK and BARKETT, Circuit Judges.

BIRCH, Circuit Judge:

An Alabama jury found petitioner Thomas D. Arthur ("Arthur") guilty of

capital murder and recommended that he be sentenced to death.  After exhausting

his state court remedies, Arthur filed a federal habeas corpus petition pursuant to

28 U.S.C. § 2254. The district court denied Arthur's habeas petition, but granted a certificate of appealability ("COA") on four issues. After a thorough review of the record, and having the benefit of oral argument and the parties' briefs, we AFFIRM the district court's judgment denying Arthur habeas relief.

## I. BACKGROUND

A. Facts[1]

On 1 February 1982, at 9:12 A.M., police officers were called to the residence of Mary Jewel "Judy" Wicker ("Wicker") and Troy Wicker ("Troy") in Muscle Shoals, Alabama. The officers found Troy murdered in his bed; his wife, Wicker, lying on the floor with traces of blood on her face; and her sister, Teresa Rowland ("Rowland"), kneeling beside her. R1-22, Exh. Vol. 6 at 315-16. The investigators found four .22 caliber expended cartridge cases on the bed. An autopsy revealed that Troy's death was caused by a close range wound through his right eye from a .22 caliber long rifle bullet which severed his brain stem.

Wicker told the investigators that, after she had dropped her children off at school, she had returned to find an African American man in her home. She said

---

[1] Except as otherwise cited, the facts are taken from opinions of the Alabama Court of Criminal Appeals. See Arthur v. State, 711 So. 2d 1031, 1043 n.1 (Ala. Crim. App. 1996) ("Arthur VI") (referencing the "earlier rendition of the facts found at Arthur v. State, 575 So. 2d 1165, 1167-70 (Ala. Crim. App. 1990) [("Arthur IV")] for an overall picture of the evolution of this case").

that the man raped her, knocked her unconscious, and shot Troy. Wicker was subsequently charged and convicted of murdering Troy to collect insurance proceeds, and was sentenced to life imprisonment. See Wicker v. State, 433 So. 2d 1190 (Ala. Crim. App. 1983). Some time after Wicker's conviction, the prosecuting district attorney appeared before the parole board to inquire about the possibility of an early release in exchange for Wicker's testimony against Arthur. Wicker's daughter, Tina Jenkins, retained attorney Gary Alverson to appear at this meeting on her behalf. Alverson was later hired as a state prosecutor.

In 1991, during Arthur's trial for Troy's murder, Alverson represented the state and Wicker testified as the prosecution's main witness. She explained that she had known Arthur since they were both young and worked at Tidwell Homes. She revealed that she, Rowland, and Rowland's boyfriend, Theron McKinney ("McKinney") had discussed killing Troy beginning in early 1981. R1-22, Exh. Vol. 9 at 747-48. Wicker explained that Troy was physically violent with her, and that Rowland and Troy often argued when Troy threatened to turn Rowland in to the police for the arson on her home which he had committed for her. Wicker recalled that she received a telephone call from Arthur in November 1981 in which he told her that he had been "hired to do the job . . . [to] kill [her] husband." Id. at 748-51. She saw him the next week and began a sexual relationship with him. At

that time, Arthur was residing at the Decatur Work Release Center and was assigned to work at Reagin Mobile Homes.

Wicker testified that she knew that the murder was to take place on 1 February 1982, and that she had agreed to tell the police that her home was burglarized and that her husband was murdered by an African American man. She explained that, on the day of the murder, she met Rowland and Arthur at the airport. She stated that Arthur, who had been drinking and was carrying a gun and a garbage bag, had painted his face black and put on an Afro wig and black gloves. She testified that Arthur got into her car and, while driving him to her house, she urged him not to kill Troy. She stated that, after they arrived at her house, she heard a shot and that Arthur then struck her, knocked out several of her teeth, and lacerated her lip. Wicker admitted that, after she collected $90,000 in insurance proceeds from Troy's death, she paid Arthur $10,000, paid Rowland $6,000, and gave McKinney jewelry and a car for their assistance in the murder. She also admitted that she continued her relationship with Arthur after the murder.

Wicker's testimony was corroborated by other witnesses and evidence. Muscle Shoals Police Sergeant Eddie Lang testified that, while he was working at a school crossing about 7:40 A.M. on 1 February, he observed Wicker driving east toward the airport and, about 10 minutes later, returning toward her house. He did

4

not see anyone in the car with her during either trip. The work release facility's records for the day of the murder showed that Arthur had signed out of work release at 6:00 A.M. and had not returned until 7:50 P.M. Joel Reagin, the owner of Reagin Mobile Homes, was unable to say whether Arthur was at work on the day of the murder. He remembered, however, having seen Wicker and Arthur together at Reagin Mobile Homes while Arthur was working there.

Patricia Yarborough Green, a waitress at Cher's Lounge, testified that, on 31 January 1981, the day before the murder, Arthur asked her to send a friend to purchase .22 caliber Mini-Mag long rifle bullets for him and gave her $10 for the purchase. She said that, while they were waiting for the friend to return with the bullets, Arthur told her that they would be used to kill someone. She gave the bullets to Arthur when she received them. Debra Lynn Phillips Tynes, the manager of Cher's, went to lunch with Arthur on the day of the murder. While they were out, Arthur drove to a bridge over the Tennessee River, stopped the car, and dropped a black garbage bag into the river. She said that he explained to her that he wanted to get rid of some old memories. On the day of the murder, Wicker's automobile was found in the parking lot at Northwest Junior College in Tuscumbia, Alabama. Inside the car, officers found Wicker's purse and an Afro wig; the inside of the wig contained no human hairs.

5

In March 1982, officials at the work release center discovered a discrepancy between the amount of time that Arthur had logged as being at work and the amount of money that he had been paid for that work, and transferred him to the county jail pending investigation. After he left the work release center, his personal belongings at the work release center were inventoried and a Reagin Mobile Homes envelope containing $2000 was discovered.

In April 1982, Arthur was interviewed by a Muscle Shoals Police Department detective and denied knowing anything about Troy's homicide or knowing Wicker or Rowland. When the officer confronted Arthur with contrary information, Arthur asked to see an attorney and refused to make any further comments.

B. Procedural History

Arthur was indicted and charged with intentionally murdering Troy by shooting him with a pistol after having been convicted of second degree murder in violation of Ala. Code § 13A-5-40(a)(13) (1975). He was convicted and sentenced to death in 1982. Arthur v. State, 472 So. 2d 650, 654 (Ala. Crim. App. 1984) ("Arthur I"). The Alabama Supreme Court reversed this conviction, holding that the details of Arthur's prior second-degree murder conviction were improperly admitted at trial under the identity exception to the general

6

exclusionary rule, In re Arthur, 472 So. 2d 665, 668-70 (Ala. 1985) ("Arthur II"), and the Alabama Court of Criminal Appeals remanded the case for a new trial, Arthur v. State, 472 So. 2d 670 (Ala. Crim. App. 1985) ("Arthur III").

Arthur's second trial occurred in 1987. He was again convicted, and sentenced to death. On appeal, the Alabama Court of Criminal Appeals reversed this conviction, holding that the admission of Arthur's statement to a police officer roughly two weeks after he had asserted his right to remain silent constituted plain error because Arthur did not initiate the conversation and there was no evidence that he had been given access to an attorney following his assertion of his right to remain silent. Arthur v. State, 575 So. 2d 1165, 1171-75 (Ala. Crim. App. 1990) ("Arthur IV"). The State of Alabama's petition for writ of certiorari was denied. In re Arthur, 575 So. 2d 1191 (Ala. 1991) (per curiam) ("Arthur V").

In December 1991, Arthur was tried again. Before the trial began, Arthur advised the court that he was concerned about the attorneys who had been appointed to represent him. R1-22, Exh. Vol. 5 at Trial Transcript 15-24. He explained that, after the reversal of his second trial in 1990, he did not hear from his appointed counsel, William Del Grosso ("Del Grosso") or any other attorney until July 1991. In July 1991, he received visits at the prison from both attorney Harold Walden and from Del Grosso. Walden indicated that Del Grosso would be

7

serving as lead counsel. During his meetings with Walden and Del Grosso, Arthur requested that they move for the appointment of an investigator because there were "many aspects of this case" that had never been investigated. Id. at 16-18. Arthur explained that he attempted to communicate with Del Grosso through at least thirteen letters and at least forty telephone calls, but did not receive a response. Finally, in November 1991, less than one month before the trial was to begin, Arthur was contacted by an investigator. The investigator told Arthur that it was physically impossible to conduct the investigation that he had requested before the trial was scheduled to begin.

Because of his concerns about Del Grosso's representation of him, Arthur requested leave to participate as counsel during the trial. The trial court permitted Arthur to act as "co-counsel" with his appointed attorneys, Harold Walden and his son, Joseph Walden, and Del Grosso, as "stand-by counsel." R1-22, Exh. Vol. 1 at 5, 66; id., Exh. Vol. 5 at Trial Transcript 24-27. Arthur actively conducted much of the voir dire, examinations and arguments. He cross-examined all of the prosecution witnesses and presented four defense witnesses; he did not testify on his own behalf. The defense witnesses testified about the crime scene, the source of the money in Arthur's possession, and the pressure that Green had received from the police for testimony about the bullets. In an attempt to provide an alibi

defense, Arthur asked Reagin whether he remembered one of his employees, Larry Whitman, saying that he had seen Arthur on the morning of the murder. Arthur did not, however, either reference or call potential alibi witnesses Alphonso High or Ray Melson. The jury returned a verdict of guilty as charged at 5:05 P.M. on 5 December 1991. Id. at Exh. Vol. 11 at 1149-50.

At 5:33 P.M. on 5 December, the sentencing phase began. Id. at 1165. Walden argued for mitigation based on (1) Arthur's good conduct while in prison and his participation in a program to deter crimes as a speaker in high schools; and (2) the disproportionate punishment Arthur was facing as compared to the other persons involved in the crime. Arthur followed Walden and argued that he should be sentenced to death. He explained that he did not have a death wish and did not believe that he would be executed. He elaborated that he had previously been convicted and sentenced to death twice for Troy's murder and both of those convictions had been reversed on appeal. He claimed that a death sentence would allow him to spend more time with his children during their visits while he was in prison, provide him with a more private cell, and give him more control over his appeal.

The jury began deliberations at 6:28 P.M. and returned an advisory verdict of death at 7:25 P.M. Id. at 1233, 1236-37. The trial court found that the

9

aggravating factor, Arthur's conviction for second-degree murder, outweighed the mitigating factor, the culpability of the un-prosecuted accomplices, Rowland and McKinney, and sentenced Arthur to death.

Following this trial, court-appointed counsel Harold Walden and Joseph Walden were permitted to withdraw, and attorney Michael Sanderson was appointed to represent Arthur on appeal. Kevin M. Doyle and Barry J. Fisher were later substituted in Sanderson's place as Arthur's counsel for his appeals and petitions for postconviction relief. Arthur's third conviction was affirmed. Arthur v. State), 711 So. 2d 1031 (Ala. Crim. App. 1996) ("Arthur VI"). While his case was on appeal, attorney Fisher was permitted to withdraw as counsel. Arthur appealed to the Supreme Court of Alabama. In re Arthur, 711 So. 2d 1097 (Ala. 1997) ("Arthur VII"). He was initially represented by attorney John P. Rall and, upon his withdrawal, by attorney Lajuana Davis. Id. at 1098. The judgment of the Alabama Court of Criminal Appeals was affirmed and the certificate of judgment issued on 7 April 1998. Id. at 1098, 1101. Arthur did not file a petition for writ of certiorari to the United States Supreme Court.

In "mid to late October 2000," attorney Arnold J. Levine agreed to represent Arthur in his state and federal postconviction relief proceedings. R1-1 at 149. In January 2001, Arthur's state petition for postconviction relief pursuant to Alabama

Rule of Criminal Procedure 32 was filed challenging his 1996 conviction and sentence, and he moved for leave to file the postconviction petition out of time.[2] On 14 March 2001, the trial court's dismissal of the postconviction petition as untimely was affirmed on appeal because of the "mandatory and jurisdictional" two-year limitations period required by Alabama Rule of Criminal Procedure 32.2(c). Arthur v. State, 820 So. 2d 886, 888-90 (Ala. Crim. App. 2001) (per curiam) ("Arthur VIII").[3] On 23 March 2001, the Supreme Court of Alabama set Arthur's execution date for 27 April 2001. In re Arthur, 821 So. 2d 251 (Ala. 2001) ("Arthur IX"); R1-11 at 1. His motion for rehearing of the Alabama Court of Appeals' affirmance of the trial court's dismissal of his petition was denied. Arthur VIII at 886. His petition for writ of certiorari was also denied. Arthur v. Alabama, 535 U.S. 1053, 122 S. Ct. 1909 (2002) ("Arthur X").[4]

On 20 April 2001, Arthur, represented by attorneys Levine and E. Niki Warin, filed a federal petition for writ of habeas corpus.[5] The district court stayed

---

[2] Attorney Levine represented Arthur in these filings.

[3] Levine again represented Arthur in this proceeding.

[4] Levine represented Arthur in these filings.

[5] In his federal habeas petition, Arthur alleged numerous claims of ineffective assistance of trial and appellate counsel. He also maintained that the trial court erred by allowing him to act as his own "co-counsel;" failing to determine Arthur's competence to stand trial; failing to grant Arthur a continuance for investigation and for his attorney to prepare an adequate defense; admitting inadmissable evidence, hearsay, and the testimony of a perjured witness during the guilt-phase;

the federal petition for writ of habeas corpus pending the Alabama courts' disposition of his state petition for postconviction relief and granted a stay of execution. On appeal, we denied the motion to vacate the stay.[6] Arthur v. Haley, 248 F.3d 1302, 1303 (11th Cir. 2001) (per curiam) ("Arthur XI").

Following the dismissal of Arthur's state postconviction petition, Arthur filed a memorandum in support of his federal habeas petition.[7] In the memorandum, Arthur argued that his untimely claims should be considered because he was actually innocent and because Alabama created an

---

removing several prospective jurors who did not indicate their views on capital punishment; impermissibly failing to sequester the selected jurors; permitting the jury to engage in impermissible conduct; failing to require the state to comply with Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963); and failing to provide him with the basic tools to present a defense.

Arthur also raised other issues, arguing that the trial court erred by questioning the jurors about their views on the death penalty but not on their views regarding a life sentence; that he was impermissibly transferred to a county outside the county where the murder occurred; that he was unconstitutionally indicted because he was charged twice, within the same indictment, for the same offense and because his 1977 offense was used as an element of the offense; that he was denied discovery and the ability to present crucial evidence; that the prosecutor improperly extracted promises from the jurors to rely on certain evidence; that the trial court's guilt-phase instructions were fundamentally flawed; and that his third retrial constituted double jeopardy. He also argued that his right to a reliable sentencing was violated when: the verdict form given to the jury only recommended death; he was permitted to argue for death; there was no consideration of non-statutory mitigating evidence; and the prosecutor made improper, highly prejudicial comments during closing arguments. He also contended that the death penalty, as applied in Alabama, constituted cruel and unusual punishment. R1-1.

[6] In the appeal from the order granting a stay of execution, Arthur was represented by attorneys Levine and Bryan A. Stevenson. Arthur XI, 248 F.3d at 1302.

[7] The district court granted attorneys Suhana S. Han and Theresa Marie Trzaskoma admission pro hac vice, and they joined Levine in the representation of Arthur. Han, Levine, and Trzaskoma continue to represent Arthur on appeal.

unconstitutional impediment to his timely filing and extraordinary circumstances. He also argued that his trial and sentencing were constitutionally defective because the prosecutor had an irreconcilable conflict of interest, his trial and appellate counsel were ineffective, and the trial court failed to ensure that Arthur's decisions to represent himself and to request the death penalty were knowing and voluntary.

The district court dismissed Arthur's habeas petition finding "no lawful ground to excuse the untimeliness of the petition," R3-55 at 1, and denied Arthur's motion to alter or amend judgment. The district court granted a certificate of appealability on the claims requested by Arthur and deemed Arthur's motion for a certificate of appealability as his notice of appeal.

## II. ISSUES

1. Whether Arthur was entitled to consideration of the merits of his habeas petition claiming actual innocence.

2. Whether Arthur was entitled to discovery and a hearing to further develop his actual innocence claim.

3. Whether statutory tolling should be applied to the statute of limitations governing Arthur's claims and whether he is entitled to discovery on this issue.

13

4.  Whether equitable tolling should be applied to the statute of limitations governing Arthur's claims and whether he is entitled to discovery on this issue.

### III.  STANDARD OF REVIEW

We review <u>de novo</u> the district court's dismissal of a state prisoner's petition for writ of habeas corpus.  <u>See</u> <u>Drew v. Department of Corr.</u>, 297 F.3d 1278, 1283 (11th Cir. 2002).  This review includes the determination that the petition was time-barred under the Antiterrorism and Effective Death Penalty Act's ("AEDPA") limitation period.  <u>Moore v. Crosby</u>, 321 F.3d 1377, 1379 (11th Cir. 2003).  We also review <u>de novo</u> the district court's resolutions of legal questions and mixed questions of law and fact.  <u>Mincey v. Head</u>, 206 F.3d 1106, 1131 (11th Cir. 2000).  Because the question of a party's diligence is a question of fact, we review it, and other factual findings, for clear error, and will affirm "unless the record lacks substantial evidence to support that determination." <u>Drew</u>, 297 F.3d at 1283 (internal quotations and citation omitted).  We review for abuse of discretion the district court's denial of discovery, <u>Bracy v. Gramley</u>, 520 U.S. 899, 909, 117 S. Ct. 1793, 1799 (1997), and of an evidentiary hearing regarding equitable tolling.  <u>Drew</u>, 297 F.3d at 1283.  Under the abuse-of-discretion standard, we consider whether the district court's decision was based on an erroneous legal conclusion because "[a] district court by definition abuses its

14

discretion when it makes an error of law." Koon v. United States, 518 U.S. 81, 100, 116 S. Ct. 2035, 2047-48 (1996). Finally, our review in a case that challenges a state conviction under 28 U.S.C. § 2254, as amended by the AEDPA, "is greatly circumscribed and is highly deferential to the state courts." Crawford v. Head, 311 F.3d 1288, 1295 (11th Cir. 2002).

## II. DISCUSSION

We begin ~~by~~ our treatment of Arthur's claims by reviewing the statute under which his application was held to be time-barred, and then consider whether his claims are appropriate for any of the exceptions to that bar.

### A. The Statute of Limitations

An application for writ of habeas corpus, filed by a person in custody subject to a state court judgment, is due to be filed within one year, in relevant part,

> from the latest of–
>    (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>    (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>       . . . .

15

28 U.S.C. § 2244(d)(1). We have held that, in a situation as that presented here, where the § 2244(d)(1) limitation period has expired and the petitioner is claiming actual innocence, we must first consider whether the petitioner can show actual innocence before we address whether an exception to the limitation period is required by the Suspension Clause of the United States Constitution, U.S. Const. art. I, § 9, cl. 2. Wyzykowski v. Department of Corr., 226 F.3d 1213, 1218 (11th Cir. 2000). In Wyzykowski, we left open the question of whether the § 2244 limitation period to the filing of a first federal habeas petition constituted an unconstitutional suspension of the writ because we found the record inadequate for our review of the actual innocence claim. Id. at 1218-19; see also Sibley v. Culliver, 377 F.3d 1196, 1205 (11th Cir. 2004) ("Following Wyzykowski," we declined to reach the merits of whether the Suspension Clause requires an exception to the § 2244 limitations period because the petitioner failed to make a sufficient showing of actual innocence).

B. Arthur's Claims of Exception to the Statute of Limitations

    1. Actual innocence

In 2002, Arthur submitted affidavits in support of his claim of actual innocence.[8] He maintained that these witnesses could corroborate that he was not at the Wicker residence on the morning of the murder.

Alphonso High, the owner of Copper Mobile Homes in 1982, said that, "[o]n the morning February 1, 1982 around 9 a.m., Tommy Arthur stopped by [his] place of business" and they "talked for approximately 30 minutes." R2-36, Exh. High Aff. at 1. High commented that he did not "notice anything unusual about [Arthur]. He acted like he always did, and he did not appear to be nervous or agitated." Id. at 2. He said that, "about two months" after the murder, he "recalled that he had spoken to [Arthur] the morning of the murder" but never told "anybody about [the] conversation" and was "never . . . approached by the police or [Arthur's] trial or appellate attorneys." Id.

High's testimony was corroborated by Ray Melson, who had worked for High at Copper Mobile Homes in 1982. Melson stated that Arthur visited Copper Mobile Homes "[o]ne morning in 1982" "between 8 a.m. and 9 a.m." and that they visited for about 20 to 30 minutes. R2-41, Exh. B at 1. The following day, Melson heard the news that Troy was murdered on the same day as Arthur's visit.

_____

[8] Although, in the district court, Arthur submitted affidavits of Alphonso High, Billy Peebles and Ray Melson, he relies on only those of High and Melson on appeal.

Id. at 2. He explained that, after he realized that he had seen Arthur on the morning of the murder, he and High had discussed Arthur's visit and commented that they "would have expected [Arthur] to be nervous or agitated, but he wasn't." Id. He said that he did not tell anyone about his visit with Arthur on the morning of the murder and was not approached by Arthur's trial or appellate attorneys. Id. at 2.

In response to Arthur's affidavits, the state submitted their own affidavits from High and Melson. In High's second affidavit, High stated that, "[u]pon further consideration," he could not "say for sure whether" he had seen Arthur on 1 February 1982 or another day in late January or early February of that year, and was "not sure" whether the time when he saw Arthur was at 8:30 or 9:00 A.M. R2-39, Exh. A, High Aff. Melson provided a second affidavit to "clarify some things," specifically that, although it was "true and correct" that Arthur had visited Copper Mobile Homes on a day when High and Melson were leaving to deliver a mobile home to Birmingham, he was unable to "say exactly" the day or month the visit occurred. R3-53, Exh. D at 1.

Arthur responded with affidavits to clarify or discount the second affidavits obtained from High and Melson. Arthur's attorney, Suhana Han, stated that she was told by High's assistant that one of the representatives from the Alabama

18

Attorney General's office appeared in their office "carrying a gun in his holster." R2-41, Exh. A at 2, ¶ 5. After Han asked High for an affidavit clarifying his first affidavit, High said no and expressed concern that he had "a family to support and a business to run," and did not want to be arrested for perjury. Id. at 3, ¶ 6. When Arthur's investigator attempted to meet with Melson after his second affidavit, Melson "refused to speak" to them, "ordered [them] off his property," and, during a second visit, announced to them that he was "answerable" only to an Assistant Attorney General. R3-54, Exh. A, Gustat Aff. at 7-8, ¶¶ 19-20.

A habeas petitioner asserting actual innocence to avoid a procedural bar must show that his conviction "probably resulted" from "a constitutional violation." Schlup v. Delo, 513 U.S. 298, 327, 115 S. Ct. 851, 867 (1995) (quoting Murray v. Carrier, 477 U.S. 478, 496, 106 S. Ct. 2639, 2649 (1986)). The petitioner meets the "probably resulted" standard by demonstrating that, based on the new evidence, "that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." Schlup, 513 U.S. at 327, 329, 115 S. Ct. at 867-68. The "reasonable doubt" standard is not to be determined on the basis of the district court's independent judgment, but should be based on the district court's "probabilistic determination about what reasonable, properly instructed jurors would do." Id. at 329, 115 S. Ct. at 868. The petitioner

19

must support the actual innocence claim "with new reliable evidence–whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence–that was not presented at trial." Id. at 324, 115 S. Ct. at 865. A petitioner meets the "threshold showing of innocence" justifying "a review of the merits of the constitutional claims" if the new evidence raises "sufficient doubt about [the petitioner's] guilt to undermine confidence in the result of the trial." Id. at 317, 115 S. Ct. at 862.

The affidavits of High and Melson contradict the testimony that Judy Wicker gave at trial that Arthur was with her, and would show that Arthur was about an hour away on the morning of the murder. See R2-36, Exh. Gustat Aff. at 2, ¶ 10; R3-54, Exh. A, Gustat Aff. at 4, ¶ 9. Arthur contends that both High and Melson were credible. He maintains that, during High's first meeting with the investigator, High stated that his long-term memory was better than his short-term memory, recalled the make and model of the vehicle that Arthur was driving, pounded his fist on the table for emphasis, and was not provided with any information about the murder, including the date, before he gave his recollection of his visit with Arthur. See R2-36, Exh. High Aff. at 1, ¶ 3; R3-54, Exh. Gustat Aff. at 4, ¶ 9; 8-9, ¶¶ 21-22. Melson corrected the details in a draft of his initial affidavit, and spent time and energy to have his affidavit notarized. See R3-54,

Exh. Gustat Aff. at 5-6, ¶¶ 13-15.  During Melson's four separate meetings with Arthur's investigator, Melson never expressed any doubt about his statement and the investigator did not observe any indication that Melson was under the influence of pain medication.  Id. at 2-8, ¶¶ 5-20.

Arthur argues that any inconsistencies between High's first and second affidavits can be explained by the Attorney General's threatening tactics.  He maintains that the delay in presenting the evidence was caused by the constitutionally deficient performance of Arthur's counsel and the state of Alabama's failure to provide Arthur with postconviction legal assistance.  The state responds that the contents of the affidavits are not "new" because Arthur has known both his whereabouts at the time of the murder and the names of the people with whom he was with at the time of the murder for over twenty years.  It contends that Arthur could have presented such evidence during his third trial, when he acted as his own counsel.  It also maintains that the affidavits are suspect because Arthur, High, or Melson did not come forward with the information during Arthur's three trials, did not come forward with the information until after the district court had granted a stay of execution, and because High and Melson had recanted their statements as to the exact date on which they saw Arthur.

The new affidavits of High and Melson are insufficient to satisfy this threshold showing under Schlup; what little doubt they raise as to Arthur's guilt in no way undermines confidence in the result of his trial. To begin with, we observe that exclupatory affidavits "produced . . . at the 11th hour with no reasonable explanation for the nearly decade-long delay" are "suspect." Herrera v. Collins, 506 U.S. 390, 423, 113 S. Ct. 853, 872 (1993) (O'Connor, J., concurring). Such suspicion is especially warranted when, as here, certain important details of the affidavits were subsequently disavowed by the affiants themselves. The documents are substantively unimpressive as well. High and Melson's revised testimony would, at best, attack the credibility of Wicker, whose own statements were corroborated by other witnesses and evidence submitted at trial. The district court did not clearly err in finding that Arthur was unable to meet the standard necessary to avoid a procedural bar, and to show that his conviction probably resulted from a constitutional violation.

2. Entitlement to a Hearing and Discovery

Arthur argues that he was entitled to develop his claim of actual innocence and that a hearing is necessary to assess the reliability of High and Melson's affidavits. He maintains that the district court erred by applying the due diligence requirement of 28 U.S.C. § 2254(e)(2) because he was seeking to establish a

"gateway claim" of actual innocence to excuse his untimeliness and not a review

of the merits of the claim. He also contends that he should not be held responsible

for his counsel's failure to investigate or develop the record. He maintains that,

because of the advancements in DNA technology since his trial, tests on the

physical trial evidence could produce new evidence that could not have been

developed at trial.

While his habeas petition was pending, Arthur moved for leave to conduct

discovery related to his claim of actual innocence and good cause for his failure to

raise the actual innocence claim in state proceedings. Specifically, he sought

physical evidence from the murder[9] and documents concerning the Holman Prison

death row library.[10] The district court denied the request for the physical crime

evidence finding that the evidence regarding his actual innocence claim would

"[a]t best . . . impeach Judy Wicker's testimony" and would not establish his actual

_____

[9] Arthur sought: the clothing that Wicker was wearing on the day of the murder, the rape kit created on the day of the murder, the hair samples and the wig that were recovered from Wicker's car, the hair sample and vacuum sweepings recovered from Wicker's residence, the spent cartridge casings and pillowcase found near Troy's body, the bullet recovered from Troy, and the photographs of the crime scene. R2-33, Memorandum at 8.

[10] Arthur sought a detailed list and categorization of the books, federal habeas corpus statutes, and other written materials carried by the library; the budget of the library; information concerning the typewriters, photocopying machines and writing materials available to the inmates; activities and services located in or available at the library that were unrelated to reading, writing, and research; information regarding the inmates' access to the library; and the prison's document retention and destruction policy. R2-33, Memorandum at 13.

innocence claim.[11]  R3-55 at 7.  The court denied the request for the Holman prison library evidence because it bore no relation to a constitutional claim.  The district court held that Arthur was not entitled to an evidentiary hearing to question High and Melson because he had "made no attempt to show he diligently pursued the factual predicate of his alibi claim in [any] state court."  Id. at 15.

Generally, "[a] habeas petitioner . . . is not entitled to discovery as a matter of ordinary course," but may obtain leave of court to conduct discovery pursuant to "Rules Governing Section 2254 Cases" upon showing "good cause," Bracy, 520 U.S. at 904, 117 S. Ct. at 1796-97, and diligence in pursuing the claim for which discovery is sought, consistent with 28 U.S.C. § 2254(e)(2), Isaacs v. Head, 300 F.3d 1232, 1249 (11th Cir. 2002).  Good cause is demonstrated "'where specific allegations . . . show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he . . . is entitled to relief.'" Bracy, 520 U.S. at 908-09, 117 S. Ct. at 1799 (quoting Harris v. Nelson, 394 U.S. 286, 300, 89 S. Ct. 1082, 1091 (1969).  A petitioner claiming actual, and not legal,

---

[11] The district court examined each individual discovery request.  R3-55 at 5-8.  Arthur sought the rape kit, Wicker's clothing, the hair samples, the wig, and the vacuum sweepings to discredit Wicker's testimony during his third trial.  Id. at 6-7, n. 6.  He sought the cartridge casings and bullet to show inconsistencies with the trial testimony that the type of bullets that he purchased and the cartridges and bullet found at the crime scene.  He sought the pillowcase and crime scene photographs to dispute expert testimony that Troy was shot at a close range.  Similar evidence was, however, presented during the trial and weighed by the jury in their consideration during the guilt phase.

innocence will typically show that the wrong person was convicted of the crime. Sawyer, 505 U.S. at 339-41,112 S. Ct. at 2519-20. A district court's denial of discovery is reviewed for abuse of discretion where the petitioner has shown "'good cause' for the discovery.'" Bracy, 520 U.S. at 909, 117 S. Ct. at 1799.

In reviewing a state writ of habeas corpus in which the petitioner failed to develop the factual basis for a claim in the state court proceedings, the district court

> shall not hold an evidentiary hearing on the claim unless the applicant shows that–
> (A) the claim relies on–
> . . . .
> > (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2). In this statute, "Congress has given prisoners who fall within § 2254(e)(2)'s opening clause an opportunity to obtain an evidentiary hearing where the legal or factual basis of the claims did not exist at the time of state-court proceedings." Williams v. Taylor, 529 U.S. 420, 436, 120 S. Ct. 1479, 1490 (2000). "[A] failure to develop the factual basis of a claim is not established

unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." Id. at 432, 120 S. Ct. at 1488.

> The question is not whether the facts could have been discovered but instead whether the prisoner was diligent in his efforts . . . . Diligence for purposes of the opening clause depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court; it does not depend . . . upon whether those efforts could have been successful. Though lack of diligence will not bar an evidentiary hearing if efforts to discover the facts would have been in vain, and there is a convincing claim of innocence, only a prisoner who has neglected his rights in state court need satisfy these conditions.

Id. at 435, 120 S. Ct. at 1490 (citations omitted).[12] Although a defendant represented by constitutionally ineffective counsel will not be held responsible for attorney error, the claim of ineffective assistance of counsel must have first been presented to the state court before it can be used to establish cause for the default. Murray, 477 U.S. at 488-89, 106 S. Ct. at 2645-46. A district court properly applies § 2254(e)(2)'s diligence requirement in determining whether to conduct an evidentiary hearing. Isaacs, 300 F.3d at 1248-49.

Arthur failed to satisfy the diligence requirement of § 2254 both as to the requested discovery and as to the evidentiary hearing. He failed to pursue the

---

[12] A claim is not precluded under § 2254(e)(2) "unless the undeveloped record [on the factual basis of a petitioner's claim] is a result of his own decision or omission." McDonald v. Johnson, 139 F.3d 1056, 1059 (5th Cir. 1989).

testing of the requested crime-related physical evidence during his three trials or through a state postconviction relief petition. See id. at 1249-50 (affirming the denial of an evidentiary hearing where the petitioner knew of the factual basis at the time of his state appeal, and had multiple opportunities to raise the issue during state court proceedings over a period of ten years). He failed to show that his claim of actual innocence was unavailable to him before the statute of limitation expired. He also failed to demonstrate "good cause" for his failure to seek the requested crime-related discovery. Accordingly, the district court did not abuse its discretion in denying Arthur's request for discovery and an evidentiary hearing.

3. Statutory Tolling

Arthur argues that statutory tolling should apply because Alabama unconstitutionally failed to provide him with state postconviction counsel, any other form of legal assistance, or access to an adequate law library. He contends that he suffered actual harm as a result not having counsel because he has received no state or federal postconviction review of the merits of his claims. He maintains that his habeas petition is timely because, since he was unable to locate pro bono counsel until October 2000, the federal period of limitations did not end until October 2001. He claims that he suffered an actual injury from the inadequacies

in the prison law library because he was unable to timely prepare and file a state postconviction petition and a federal petition for writ of habeas corpus. He asserts that this injury resulted from Alabama's failure to provide him with the procedures for requesting materials and history of providing the requested materials only after an adequate habeas corpus petition was filed.

The district court denied Arthur's claim of statutory tolling, holding that the state did not unconstitutionally impede the timely filing of Arthur's federal habeas petition. It found that, because Arthur "did not avail himself of the [Alabama] procedure for obtaining [postconviction] counsel," he could not show that he would have been denied counsel if he had pursued such relief, and that Arthur had "provided no support" for his claim that Holman Prison death row inmates were provided inadequate access to the library. R3-55 at 20. It also found that Arthur's evidence that he was unable to obtain private counsel did not satisfy his burden of showing that he suffered an actual injury from the Alabama procedure for obtaining postconviction counsel.

A person in state custody filing a petition for writ of habeas corpus is subject to a one-year statute of limitation which

> shall run from the latest of–
> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

28

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action.

28 U.S.C. § 2244(d)(1). Thus, if the petitioner was prevented from filing his habeas corpus petition as a result of "illegal state action," the limitation period will not begin until the state impediment is removed. Wyzykowski, 226 F.3d at 1216.

Prisoners, including those under a sentence of death, have no constitutional right to the appointment of counsel for postconviction proceedings. Murray v. Giarratano, 492 U.S. 1, 10, 12, 109 S. Ct. 2765, 2771-72 (1989) (holding that Pennsylvania v. Finley, 481 U.S. 551, 555-57, 107 S. Ct. 1990, 1993-94 (1987) applied to death penalty cases).[13] We have declined to find an exception even "when the state collateral proceeding was the petitioner's first opportunity to raise the claim." Hill v. Jones, 81 F.3d 1015, 1025-26 (11th Cir. 1996).

Such an exception is unnecessary, however, because Alabama provides for the appointment of counsel for a petitioner seeking postconviction relief. An indigent petitioner, who desires the assistance of counsel, may seek appointment

---

[13] See also Coleman v. Thompson, 501 U.S. 722, 752, 111 S. Ct. 2546, 2566 (1991) ("[A] petitioner cannot claim constitutionally ineffective assistance of counsel" "in state post-conviction proceedings" because "[t]here is no constitutional right to an attorney" in such proceedings); Ohio Adult Parole Auth. v. Woodard, 523 U.S. 272, 281, 118 S. Ct. 1244, 1250 (1998) (recognizing that the Supreme Court had "generally rejected attempts to expand" distinctions accorded capital inmates including a constitutional right to counsel in postconviction proceedings).

of counsel if the petitioner's postconviction relief petition is not summarily dismissed. Ala. R. Crim. P. 32.7(c).[14] Similarly, an indigent federal habeas corpus petitioner, seeking relief from a judgment punishable by death, has a mandatory statutory right to appointed counsel from the district court upon filing a motion requesting such appointment. 21 U.S.C. 848(q)(4)(B), 28 U.S.C. §§ 2254(h) and 2261; 18 U.S.C. § 3006A(a)(2)(B); McFarland v. Scott, 512 U.S. 849, 858-59, 114 S. Ct. 2568, 2573-74 (1994).

To guarantee prisoners their constitutional right of access to the courts, prison authorities are required to provide prisoners with adequate law libraries or legally trained assistance to prepare and file meaningful legal papers. Bounds v. Smith, 430 U.S. 817, 828, 97 S. Ct. 1491, 1498 (1977). The primary focus is to "protect[] the ability of an inmate to prepare a petition or complaint, [and] it is irrelevant" that the state provides for the appointment of counsel in some proceedings. Id. at 828 n.17, 97 S. Ct. at 1498 n.17 (internal quotations and citation omitted). The required prison law library must supply the tools and, thus, "a capability" "that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement." Lewis

---

[14] Although Alabama suggestions that a post-conviction petitioner "need only fill in the form Rule 32 petition" to obtain appointed counsel, Appellee's Brief at 39 n.10, that form does not provide any information or questions regarding the need for appointment of counsel. See Ala. R. Crim. P. 32, App., Petition for Relief from Conviction or Sentence at In Forma Pauperis Declaration.

v. Casey, 518 U.S. 343, 355-56, 116 S. Ct. 2174, 2182 (1996). An inmate who shows that a desired actionable challenge to his sentence was "lost or rejected . . . because th[e] capability of filing suit [w]as not . . . provided, . . . demonstrates that the State has failed to furnish adequate law libraries or adequate assistance from persons trained in the law." Id., 116 S. Ct. at 2182 (internal punctuation and citation omitted).

Arthur did not seek appointment of counsel under Alabama Rule of Criminal Procedure 32.7(c) or 28 U.S.C. § 2254(h), but instead sought counsel through letters to various organizations and postings on the internet. In the letters and internet postings, he asked that the case not be referred to either the Southern Center for Human Rights in Atlanta, Georgia, or to the Equal Justice Initiative of Alabama, in Montgomery, Alabama.[15] The statute of limitation expired during his search. Arthur provided no reasons in his petition for not filing a pro se petition while seeking counsel. The Holman Prison law library has one room reserved for death row inmates. R2-40, Exh. G. The death row room is "used more as a day room" instead of a library and contains legal materials which are neither

---

[15] Arthur stated that his past experiences with these organizations were "unpleasant and non-productive" and that they did "not have the proper funding or staff to handle" their cases. R2-40, Exh. D at 1. He commented that "Alabama's court-appointed attorneys don't get paid enough to care." Id. at 2.

maintained nor updated. Id. If a death row inmate needs specific materials, the inmate can request the materials from the maintained and current library. Id. The materials were, therefore, available to Arthur upon his request. Further, Arthur was aware of time limits for filing his petition and the consequences for missing those times. In an internet posting seeking counsel, Arthur asked for "help . . . now I'm running out of time for appeals." R2-40, Exh. E (also stating "the time for appeal on my case is critical to me.") Based on the record, we cannot say that the district court clearly erred in finding that Arthur failed to avail himself of the Alabama procedures for obtaining postconviction counsel or to show that he was provided inadequate access to the prison law library, or abused its discretion in denying Arthur statutory tolling relief.

4. Equitable Tolling

Arthur argues that equitable tolling is warranted and that we should apply a more lax standard in capital cases because of the heightened importance of the potential punishment. He contends that he never received notice of the judgment which triggered the limitations period, and was unable to file a timely petition as he was not represented by counsel. He maintains that extraordinary circumstances are presented because Alabama cannot appoint counsel for postconviction proceedings until after the filing of a petition containing the grounds with "full

32

disclosure of the factual basis for those grounds." Ala. R. Crim. P. 32.6(b), 32.7(c). He maintains that he was unable to obtain the alibi evidence which he seeks to present until after his current counsel performed an extensive factual investigation. He claims that he was placed in a "Catch-22" situation when he was prevented from meeting with an investigator without obtaining counsel, and was unable to obtain counsel until he had set forth the factual basis for his claim or met with an investigator.

In the district court, Arthur argued that his failure to file a timely petition was due to Alabama's failure to provide him with notice of judgment, legal assistance, visits with investigators, or an adequate law library. The district court noted that Alabama's evidence tended to show that Arthur was aware of the Alabama Supreme Court's final ruling, even though no certificate of judgment issued on 7 April 1998. It found that, in light of the long period of time in which Arthur did nothing, Arthur had not demonstrated diligence in obtaining the status of his Alabama Supreme Court appeal. It also found that Arthur had not demonstrated that the lack of notice prevented him from timely filing a petition. It found that Arthur's efforts to obtain private counsel and to meet with private investigators did not show diligence in pursuing his habeas claims. It found that, because Arthur had not shown that he was denied materials from the general

prison library or had made any independent efforts to learn of the limitations period, he failed to show that the circumstances were outside of his control and that he was diligent. It concluded that, even in combination, the factors did not show extraordinary circumstances or that Arthur had exercised due diligence to warrant equitable tolling. R3-55 at 21-25.

In a letter received by the United States Supreme Court on 11 June 1998, Arthur stated that he had been informed that he had 90 days from the Alabama Supreme Court's "final ruling" of 20 March 1998 "to file some sort of document" in the United States Supreme Court. R2-40, Exh. C at 1. He explained that he had spent time "trying to get exact–correct mailing address" for the Supreme Court, had received the address on 2 June 1998, and had been unable to mail the letter at that time because he had used his weekly mail allowance. Id. He said that he did not have an attorney but was "trying desperately to get one using every mailing allowance" writing to organizations requesting representation. Id. at 2. He requested an extension of six months to one year to allow for him to obtain counsel and for the attorney to become familiar with Arthur's case, or 30 days to allow him to submit something on his own.[16] Arthur did not subsequently file a petition for writ of certiorari to the Supreme Court.

_____

[16] The record does not contain a response from the Supreme Court to this letter.

34

In April 2000, legal investigators Robert C. Long and Glenn Taylor requested permission to visit Arthur "to investigate certain aspects of his case and [for the purpose] of obtaining legal counsel for him." R2-40, Exh. F at 1. Two days later, the Holman Correctional Facility warden advised Long that the request was "not approved" and that "[v]isits for investigators are allowed, but by attorney request." Id. at 2. In May 2000, attorney James G. Curenton wrote to the prison, indicating that he was "contemplating representing" Arthur and requested permission for his investigators to "visit . . . and interview" Arthur. Id. at 3. The next day, the warden responded that Curenton would be accommodated "[w]hen and if you make a decision to become . . . Arthur's attorney or wish to come see him yourself" but that he could not "at this time . . . approve investigators" to visit Arthur. Id. at 4.

After the Alabama Supreme Court's 20 March 1998 affirmance of the Alabama Court of Criminal Appeal's decision affirming Arthur's conviction, a "certificate of judgment" was to have issued 18 days later, which was 7 April 1998. See Ala. R. App. P. 41(a). It is unclear when or how Arthur received information of the Alabama Supreme Court's decision, but in any event, he was aware of it when he wrote to the United States Supreme Court on 2 June 1998, and

believed that he had until 20 June 1998 to file his petition for writ of certiorari. He did not, however, timely file such a petition.

The time period specified in 28 U.S.C. § 2244 "is a statute of limitations [and] not a jurisdictional bar," which "permits equitable tolling when a movant untimely files because of extraordinary circumstances that are both beyond his control and unavoidable even with diligence." Steed v. Head, 219 F.3d 1298, 1300 (11th Cir. 2000) (internal quotations and citation omitted). As an extraordinary remedy, equitable tolling "is typically applied sparingly." Id. It may be applied if the petitioner demonstrates (1) diligence in his efforts to timely file a habeas petition and (2) extraordinary and unavoidable circumstances. Sandvik v. United States, 177 F.3d 1269, 1271 (11th Cir. 1999) (per curiam). A petitioner is not entitled to equitable tolling based on a showing of either extraordinary circumstances or diligence alone; the petitioner must also establish both. Pace v. DiGuglielmo, 544 U.S. 408, _, 125 S. Ct. 1807, 1815 (2005); Justice v. United States, 6 F.3d 1474, 1478-79 (11th Cir. 1993). We review the district court's legal decision on equitable tolling de novo and factual determinations, including that of diligence, for clear error. Lawrence v. Florida, 421 F.3d 1221, 1224-25 (11th Cir.

2005), <u>petition for cert. granted on other grounds</u>, _ U.S. _, 126 S. Ct. 1625 (U.S. Mar. 27, 2006).[17]

A determination as to whether rare and exceptional circumstances are presented requires the examination of the facts in each case. <u>Knight v. Schofield</u>, 292 F.3d 709, 711 (11th Cir. 2002) (per curiam). The focus of the inquiry regarding "extraordinary circumstances" is "on the circumstances surrounding the late filing of the habeas petition" and not on the circumstances of the underlying conviction, <u>Helton v. Secretary for the Dep't. of Corr.</u>, 259 F.3d 1310, 1314-15 (11th Cir. 2001) (per curiam), and whether the conduct of others prevented the petitioner from timely filing, <u>see</u> <u>Lawrence</u>, 421 F.3d at 1226.[18]

---

[17] The questions presented on certiorari are: (1) whether a death penalty defendant's petition for writ of certiorari to the Supreme Court to review the validity of the denial of his state petition for postconviction relief toll the § 2244 statute of limitations; (2) whether the split in the circuits concerning the tolling of the statute of limitations constitutes an "extraordinary circumstance" entitling a diligent defendant to equitable tolling while his claim is being considered by the Supreme Court on certiorari; (3) whether the special circumstance of "registry counsel," statutorily mandated to file appropriate motions in a timely manner, advising the defendant about the statute of limitations constitute an "extraordinary circumstance" beyond the defendant's control and thus entitle the defendant to equitable tolling. <u>Lawrence v. Florida</u>, No. 05-8820 (U.S. Mar. 27, 2006).

[18] <u>See also</u> <u>Kreutzer v. Bowersox</u>, 231 F.3d 460, 463 (8th Cir. 2000) (no equitable tolling where "nothing in the record which suggests the respondent has lulled [petitioner] into inaction" and a district court order granting an extension was entered two days after the statute of limitations expired); <u>Flanders v. Graves</u>, 299 F.3d 974, 977 (8th Cir. 2002) (no equitable tolling where petitioner failed to show that the respondents made it impossible or difficult for him to uncover the facts underlying the actual innocence claim or prevented him from timely filing his habeas petition); <u>Cantu-Tzin v. Johnson</u>, 162 F.3d 295, 299 (5th Cir. 1998) (no equitable tolling where petitioner chose "self-representation rather than the choice he was offered by the state" and then, "[o]nce he was ordered to proceed . . . pro se [petitioner] . . . did nothing.")

To show diligence, a petitioner claiming deficiencies in the prison law library must provide details of the specific actions taken toward filing the petition. Helton, 259 F.3d at 1314. He must show "when he found out about the library's alleged deficiency," must "state any independent efforts he made to determine when the relevant limitations period began to run," and must demonstrate how the prison "thwarted his efforts." Id. Absent such evidence, the connection between the petitioner's untimely filing and any alleged inadequacies in the library is insufficient. Id.

The record shows that Arthur was aware of the deadline to file his habeas petition and that, although he continued to seek counsel, he neither timely filed a pro se petition for postconviction relief nor filed a motion seeking the appointment of counsel. Although he may have been unable to present the testimony of the alibi witnesses until an investigation had been performed, he was in a position to proffer the names of the individuals with whom he spoke on the day of the murder. The record does not reflect any "repeated" efforts to learn the status of his case or any acts by others which prevented him from timely filing his petition. In fact, the record does not reflect any specific actions, other than seeking pro bono counsel and requesting an extension of time to file a petition for writ of certiorari, that Arthur took to timely file a petition for postconviction relief, to seek counsel

38

through either the state or federal avenues available to him, to obtain the information regarding the limitations period (or the options for seeking counsel through the state or federal systems) from the prison library or to gain the assistance of others, outside of prison, who had the ability to obtain the information for him. Absent any such evidence of diligence, the district court did not clearly err in finding that Arthur was not entitled to equitable relief.

### III. CONCLUSION

Arthur has not shown that he is has any legal grounds excusing the untimeliness of his habeas petition and thus entitling him to consideration of the merits of it. He has not established that he is actually innocent or that the district court erred in denying him discovery and an evidentiary hearing on his claim of actual innocence. He has not established that statutory tolling should be applied to the statute of limitations governing his claims. He has not established that equitable tolling should be applied to the statute of limitations governing his claims or that the district court abused its discretion in denying discovery on his equitable tolling claim. Accordingly, we affirm the district court's judgement denying Arthur habeas relief.

**AFFIRMED.**