#25263-a-DG

**2010 S.D. 73**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

| | |
|---|---|
| ELESHIA ZAHRBOCK, PEYTON GERRY and JUSTIN ZAHRBOCK, | Plaintiffs, |
| JONETTE ANSON, | Appellant, |
| v. | |
| STAR BRITE INN MOTEL, | Defendant and Appellee. |

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FIRST JUDICIAL CIRCUIT
YANKTON COUNTY, SOUTH DAKOTA

* * * *

HONORABLE ARTHUR L. RUSCH
Judge

* * * *

MANUEL J. de CASTRO, JR.
De Castro Law Offices, PLLC
and
NICHOLE CARPER                    Attorneys for appellant
Sioux Falls, South Dakota         Jonette Anson.

DANIEL R. FRITZ
DANA VAN BEEK PALMER of
Lynn, Jackson, Shultz
  & Lebrun, P.C.                  Attorneys for defendant
Sioux Falls, South Dakota         and appellee.

* * * *

ARGUED MARCH 22, 2010

OPINION FILED **09/08/10**

#25263

GILBERTSON, Chief Justice

[¶1.]    Jonette Anson (Anson) failed to file a personal injury claim within the three-year statute of limitations. The circuit court denied her motion to extend the statute of limitations under the doctrine of equitable tolling. We affirm.

**FACTS**

[¶2.]    On December 23, 2004, Eleshia Zahrbock, Peyton Gerry, Justin Zahrbock, and Anson were guests at the Star Brite Inn (Star Brite), a Yankton motel. The four guests were overcome by carbon monoxide that leaked into their rooms and suffered varying degrees of harm. Within a few weeks of the accident, Anson was contacted by Eleshia and Justin Zahrbocks (Zahrbocks) and Gerry about hiring an attorney to represent them in a suit against Star Brite.

[¶3.]    On February 7, 2005, at the Zahrbocks' suggestion, Anson and Zahrbocks met with Sioux Falls attorney Chad Swenson. During the meeting, Swenson discussed a carbon monoxide poisoning expert from Denver that he had used in similar cases in the past. He also mentioned his prior experience in a Yankton law firm. Swenson was excited about the prospects of the case and was willing to take the case immediately. Before leaving Swenson's office, Anson signed a retainer agreement with Swenson. Swenson told Anson he would be in touch after he filed the suit. A few weeks after the initial meeting with Swenson, Anson received an unsigned copy of a draft of a complaint that included Zahrbocks, Gerry, and Anson as plaintiffs. Anson believed that Swenson had filed the complaint and that the lawsuit had been commenced based on her receipt of the unsigned copy of the complaint.

[¶4.] As early as March 2005, Anson realized she was having trouble getting Swenson to return her calls. Anson was instructed by Swenson to send him copies of all medical bills associated with her injuries, which she did but she did not receive a confirmation of receipt or updates in reply. On March 14, 2005, Anson wrote Swenson a letter complaining that she had tried to reach him numerous times and that it appeared Swenson was not getting her messages. Thereafter, Anson continued to call at least once a month to get updates and usually spoke with Swenson's secretary.

[¶5.] In either April or May of 2005, Swenson spoke briefly with Anson over the telephone and told her the case was progressing as planned. He told Anson he was in negotiations with defense counsel. Swenson also advised Anson to continue with her medical care.

[¶6.] Anson was unable to speak with Swenson again until the fall of 2005, when she met with Swenson in his Sioux Falls office. Swenson told Anson during a brief meeting lasting no more than ten to fifteen minutes that the case was progressing as planned and not to be concerned. He also asked her, in a manner that suggested to Anson that the case was progressing in her favor, how many hotels she wanted to own. Swenson advised Anson he would not be retaining the Denver expert at that time to avoid incurring costs until they were further along in the case. This was the last time Anson was able to speak personally with Swenson.

[¶7.] Anson continued to call Swenson's office for updates, but her efforts to contact him were unsuccessful. She left messages with the office secretary through the fall of 2006. After that time, she was able to reach only an answering machine.

In the fall of 2006, Anson was in Sioux Falls and stopped by Swenson's office in an effort to reach him. She arrived around 2 p.m. in the afternoon and found the office door locked. Anson thought Swenson might be in court and did not think anything was amiss. Anson continued to call and leave messages for Swenson one to two times per month over the course of the next eleven to twelve months. Finally, in August of 2007, Anson discovered Swenson's number had been disconnected. She immediately called every Chad Swenson in the Sioux Falls telephone directory but failed to reach Swenson.

[¶8.]       Anson's work took her to Colorado for three months immediately following her discovery that Swenson's telephone number had been disconnected. She planned to make further attempts to reach Swenson or retain another attorney when she returned to South Dakota. In January 2008, shortly after returning from Colorado, but before she was able to make any further effort to either locate Swenson or retain a new attorney, Anson received a letter from Nichole Carper in her capacity as counsel for Zahrbocks in their suit against Star Brite.

[¶9.]       Carper's letter informed Anson that Swenson had been disbarred. Anson immediately retained Carper to represent her in the matter. However, the three-year statute of limitations had expired on Anson's claim on December 23, 2007. Anson also eventually ascertained that just a few weeks before filing their suit on December 11, 2007, Zahrbocks had learned from Justin Zahrbock's sister, who was an attorney in Sioux Falls, that Swenson had been disbarred and they were able to secure counsel and file their claim before the statute of limitations expired. Anson learned from Carper that Swenson had never filed a suit as Anson

believed he had, and Carper had timely filed a claim in Zahrbocks' name on December 11, 2007. Up until that time, Anson was unaware that a statute of limitations existed and that it had expired without Swenson filing the suit.

[¶10.]     Anson eventually also learned from Carper that Swenson was temporarily suspended from the practice of law by this Court on February 22, 2007, and was subsequently disbarred on June 14, 2007. In addition, Swenson failed to notify all clients by mail of his disbarment as required by SDCL 16-19-78.[1] Anson was unable to obtain a copy of her file from Swenson.

[¶11.]     On May 22, 2008, Anson moved to file an amended complaint. Star Brite resisted arguing the statute of limitations in SDCL 15-2-14(3) had expired on

---

1.     The Disciplinary Board of the State Bar and this Court had no reason to suspect noncompliance because on June 27, 2007, Swenson filed with this Court an affidavit in which he declared, "In accordance with the Judgment of Disbarment, I have complied with the provisions and requirements of SDCL §§ 16-19-78 through 16-19-81." *See* Matter of Discipline of Swenson, #24443 (2007). SDCL 16-19-78 requires a disbarred attorney to

> promptly notify, or cause to be notified, by registered or certified mail, return receipt requested, all clients being represented in pending matters, other than litigation or administrative proceedings, of his disbarment or suspension and his consequent inability to act as an attorney after the effective date of his disbarment or suspension and shall advise such clients to seek legal advice of the client's own choice elsewhere.

Given the chaotic nature of Swenson's files and financial records as set forth in his disbarment file, it is understandable that his counsel along with counsel of the Disciplinary Board who sought to identify and notify Swenson's clients of the situation, were not able to identify Anson as one of Swenson's clients. The disbarment file indicates that other clients suffered at the hands of Swenson as the Disciplinary Board's findings of fact, which were not challenged by Swenson, claimed a shortfall in Swenson's trust account of approximately $225,000. Rather than contest the State Bar's charges,

(continued . . .)

December 23, 2007. By leave of court, Carper filed an amended complaint on December 8, 2008, in an attempt to include Anson as a plaintiff, arguing the doctrine of equitable tolling should apply to allow the complaint. Star Brite filed a motion to dismiss the claim as untimely.

[¶12.] After a hearing on the matter, the circuit court issued a memorandum decision. It found that there were extraordinary circumstances that triggered the doctrine of equitable tolling. However, it also found that Anson did not exhibit reasonable and good-faith conduct sufficient to apply the doctrine. The circuit court entered an order dismissing Anson's claim as barred by the statute of limitations. Anson appeals raising one issue:

> Despite a finding of extraordinary circumstances, did the trial court err when it found Anson did not exhibit reasonable and good-faith conduct sufficient to apply the doctrine of equitable tolling and permit her claim despite the expiration of the statute of limitations.

## STANDARD OF REVIEW

[¶13.] This Court recently determined its standard of review for equitable tolling in *Dakota Truck Underwriters v. S. D. Subsequent Injury Fund*.

> We have, however, recognized that in reviewing the application of the doctrine of equitable estoppel, we are presented with a fully reviewable mixed question of law and fact. *See Crouse v. Crouse,* 1996 S.D. 95, ¶ 14, 552 N.W.2d 413, 417 (equitable estoppel is reviewed de novo). "Where relevant facts are undisputed and the district court denied equitable tolling as a matter of law, we review the district court's decision de novo." *Rouse v. Lee,* 339 F.3d 238, 247 (4thCir. 2003). We agree and hold that when the facts are undisputed, as they are here, we

_____

(. . . continued)

Swenson resigned as an attorney and this Court entered its Judgment of Disbarment. *In re Swenson,* #24443.

> will apply a de novo standard of review to the applicability of equitable tolling.

2004 S.D. 120, ¶ 16, 689 N.W.2d 196, 201.

## ANALYSIS AND DECISION

[¶14.]     SDCL 15-2-14(3) provides a three-year statute of limitations for an action resulting from a personal injury.  Generally, strict compliance with a statute of limitations is required to preserve a claimant's right to bring an action.  *Dakota Truck Underwriters*, 2004 S.D. 120, ¶ 17, 680 N.W.2d at 201.  "'[T]he purpose of a statute of limitations is speedy and fair adjudication of the respective rights of the parties.'"  *Peterson v. Holm,* 2000 S.D. 27, ¶ 14, 607 N.W.2d 8, 12 (quoting *State of Minn. ex rel. Hove v. Doese,* 501 N.W.2d 366, 370 (S.D. 1993)).  It further allows potential defendants "to be 'freed from the consequences of their actions after a statutory period of time resulting in peace of mind for the individual, less docket congestion, fewer administrative problems for the courts, and less work for law enforcement agencies.  Stale claims are eliminated.'"  *Id.*

[¶15.]     If legally authorized,[2] the harsh effect of a statute of limitations can be judicially modified in limited circumstances through the application of the

---

2.     Both parties approach this issue as a dispute over the factual application of equitable tolling.  This begs the underlying question of whether equitable tolling as a legal doctrine is recognized in civil actions in South Dakota.  As shown in Justice Konenkamp's concurrence in result, a very compelling argument can be made that equitable tolling cannot be recognized as a legal doctrine in South Dakota.  However, this underlying issue was not raised as part of this appeal and it is more appropriate for us to wait to decide it until we have the benefit of full argument and briefing.  As such, for purposes of this appeal, we assume, without deciding, that equitable tolling can apply as a legal doctrine and proceed to the issue before us – its factual application to

(continued . . .)

doctrine of equitable tolling. *Dakota Truck Underwriters*, 2004 S.D. 120, ¶ 18, 689 N.W.2d at 201-02.[3] Equitable tolling permits a plaintiff to bring suit after the expiration of the statute of limitations when inequitable circumstances have prevented the plaintiff from timely initiating suit. *Id.* ¶ 19, 689 N.W.2d at 202 (citing *Bailey v. Glover*, 21 Wall 342, 88 U.S. 342, 22 L.Ed. 636 (1874); *Shempert v. Harwick Chemical Corp.,* 151 F.3d 793, 797 (8thCir. 1998)). However, the application of the doctrine requires the existence of circumstances "truly beyond the control of the plaintiff." *Id.* ¶ 20, 689 N.W.2d at 202 (citing *Hill v. John Chezik Imports*, 869 F.2d 1122, 1124 (8thCir. 1989)).

[¶16.]     The threshold for consideration of equitable tolling is inequitable circumstances not caused by the plaintiff that prevent the plaintiff from timely filing. *Seitzinger v. Reading Hosp. and Med. Ctr.*, 165 F.3d 236, 240 (3rdCir. 1999) (citing *Ellis v. General Motors Acceptance Corp.*, 160 F.3d 703, 706 (11thCir. 1998); *Naton v. Bank of California*, 649 F.2d 691, 696 (9thCir. 1981); *Mathews v. Little*, Civ. A. No. 92-CV-1114, 1992 WL 192542, *2 (E.D.Pa. 1992)). Examples from other jurisdictions that may be appropriate for application of equitable tolling include

_____

(. . . continued)
     this case. As we affirm based upon the facts, the legal issue of the potential application of equitable tolling does not become dispositive.

3.    Such legal authorization of the doctrine of equitable tolling occurred in another context in 2007 with the passage of SDCL 16-3-14. It grants to this Court the authority to suspend "deadlines, time schedules or filing requirements" in cases of a "judicial emergency" which "infringes upon the normal functioning of the judicial system." SDCL 16-3-11. No such judicial emergency occurred in this case.

"when a claimant received inadequate notice of her right to file suit, where a motion for appointment of counsel is pending, or where the court has misled the plaintiff into believing that she had done everything required of her." *Id.* (citing *Baldwin County Welcome Ctr. v. Brown,* 466 U.S. 147, 151, 104 S.Ct. 1723, 80 L.Ed.2d 196 (1984)). The threshold is also met "when the defendant has actively misled the plaintiff or when the plaintiff 'in some extraordinary way' was prevented from asserting her rights[.]" *Id.* We do not suggest that the doctrine may only be applied under these specific circumstances; however, if it is legally recognized it must be limited to situations where extraordinary circumstances beyond the plaintiff's control have prevented timely filing.

[¶17.]     We first acknowledged equitable tolling in *Peterson*, but held the doctrine was not satisfied in that case because of imprudent legal practice by the plaintiff. 2000 S.D. 27, ¶ 18, 607 N.W.2d at 14. In that case, Peterson brought a medical malpractice suit in federal district court only to have the action dismissed for lack of diversity jurisdiction. *Id.* ¶ 4, 607 N.W.2d at 9. Shortly after filing her suit in federal court, Peterson was made aware she lacked diversity jurisdiction. *Id.* She, however, failed to file her state claim for over a year after she became aware of the lack of jurisdiction and instead waited for the order dismissing her suit from federal court. *Id.* ¶ 5. Peterson finally filed her suit in state court after the federal action was dismissed, which occurred over one year after the applicable statute of limitations had expired in state court. *Id.* We adopted the North Dakota Supreme Court's three-part rule for possible application of equitable tolling in *Peterson*:  the

plaintiff is required to show "(a) timely notice, (b) lack of prejudice to the defendant, and (c) reasonable and good-faith conduct on the part of the plaintiff." *Id.* ¶ 16, 607 N.W.2d at 13 (quoting *Braaten v. Deere & Co.*, 569 N.W.2d 563, 564 (N.D. 1997)). We then held that "imprudent legal practice is not reasonable conduct and would not invoke equitable tolling." *Id.* ¶¶ 16-18, 607 N.W.2d at 13-14.

[¶18.]      We next considered equitable tolling in *Dakota Truck Underwriters*, 2004 S.D. 120, 689 N.W.2d 196, in which we reversed the circuit court after finding the doctrine of equitable tolling applied to the statute of limitations at issue in that case. In *Dakota Truck Underwriters*, we were required to determine whether equitable tolling applied to untimely Subsequent Injury Fund (SIF) claims filed by workers' compensation insurers. *Id.* ¶ 4, 689 N.W.2d at 198-99. In 1999, the Legislature eliminated the SIF, but provided a limited time frame in which to file claims for injuries that occurred prior to July 1, 1999. *Id.* However, several valid claims were still pending once the time to file claims expired. *Id.* Once the claims were decided by the Department of Labor (DOL), the July 1, 1999, deadline imposed by the Legislature had expired and no avenue for submitting claims was available. *Id.* ¶ 5.

[¶19.]      The Legislature subsequently amended the SIF legislation in 2001 to allow submission of any claims that were not ripe before the July 1, 1999, deadline and ripened no later than July 1, 2001. *Id.* ¶ 7, 689 N.W.2d at 199. The amendment took effect on July 1, 2001. *Id.* However, the pre-1999 statutory scheme also contained a ninety-day statute of limitations for all SIF claims. *Id.* ¶ 3, 689 N.W.2d at 198. Under the pre-1999 statutory scheme, a SIF claim was timely

only if submitted within ninety days, but not before, a final determination or settlement by the DOL. *Id.* The claims in question were submitted to the SIF beyond the ninety-day time period after settlement, but within ninety days of the new July 1, 2001, ripening deadline created by the Legislature. *Id.* ¶ 9, 689 N.W.2d at 199. The result, according to the plaintiffs, was an "arcane procedural snare," which made any claim submitted after the ninety-day statute of limitations untimely even if submitted within ninety days of the July 1, 2001, effective date for the new claims period. *Id.* ¶ 28, 689 N.W.2d at 203.

[¶20.] The circuit court found the insurers' conduct of waiting to file their claims until the new legislation was enacted instead of submitting claims within the pre-1999 legislation's ninety-day deadline after settlement was unreasonable and not in good faith. *Id.* ¶ 26. This Court held that the insurers behaved reasonably and in good faith because it would have been futile to submit the claims settled after the July 1, 1999, deadline as there was no funding source or mechanism in place for payment by the then-defunct SIF. *Id.* ¶ 29. We held the "arcane procedural snare" created by the change in legislation equitably tolled the ninety-day statute of limitations for SIF claims and reversed the circuit court. *Id.*

[¶21.] In the instant case, the circuit court found Anson's quandary, while not "an arcane procedural snare," was an "extraordinary circumstance" not of her making and beyond her control. It found that the willful misconduct by her attorney, Swenson, created the circumstances that caused Anson to miss her filing deadline and warranted application of equitable tolling if the three-part test was satisfied. The circuit court then found the first two elements of the three-part test

for equitable tolling, (1) timely notice, and (2) lack of prejudice to the defendant, were satisfied.

[¶22.]    However, it found the third element, (3) reasonable and good-faith conduct on the part of the plaintiff in response to the extraordinary circumstances, was not satisfied. It found Anson's conduct was not reasonable and in good faith after the fall of 2005, the last time Anson had personal contact with Swenson. The circuit court found Anson should have realized within the two years after her last meeting with Swenson that he was no longer in business. Instead, she elected to call him repeatedly for two years despite receiving no contact in return. Despite finding Swenson's telephone had been disconnected, Anson still did not take an alternate course of action other than calling all other listings for Chad Swenson in Sioux Falls. Anson, according to the circuit court, should have taken some other action such as contacting the State Bar, contacting the clerk of courts, speaking with another attorney, or calling the Zahrbocks. The circuit court then granted Star Brite's motion to dismiss.

***Extraordinary circumstance warranting application of equitable tolling***[4]

---

4.    Star Brite argues in its reply brief that the circuit court erred when it found Swenson's conduct amounted to "rare and extraordinary circumstances" to which equitable tolling applied. Anson counters that Star Brite's argument is waived for failure to file notice of appeal per the provision of SDCL 15-26A-22. However, Star Brite is not raising an additional issue in order to "obtain review of a judgment or order entered in the same action which may adversely affect" it. *See* SDCL 15-26A-22. Rather, Star Brite raises an argument as to why the circuit court's ultimate decision, that the doctrine of equitable tolling did not apply, was correct.

[¶23.] Star Brite argues on appeal that Swenson's actions were not a rare and extraordinary circumstance justifying application of equitable tolling. As support for its proposition, Star Brite cites *Modrowski v. Mote*, 322 F.3d 965, 968 (7thCir. 2003), for the proposition that "attorney misconduct, whether labeled negligent, grossly negligent, or willful, is attributable to the client," and equitable tolling should not be allowed in the face of such misconduct. Anson cites to *United States v. Martin*, 408 F.3d 1089, 1093 (8thCir. 2005), for the proposition that serious attorney misconduct may warrant application of equitable tolling. However, we need not decide this issue given our holding on whether Anson exhibited reasonable and good-faith conduct as the plaintiff seeking to avail herself of the doctrine of equitable tolling.

### *Reasonable and good-faith conduct of the plaintiff*

[¶24.] We turn to the question of whether Anson's conduct in response to what she claimed were extraordinary circumstances not of her own making was reasonable and in good faith under the third prong of the equitable tolling test. The circuit court found Anson did not exhibit reasonable and good-faith conduct after her last contact with Swenson in the fall of 2005. Within the next two years up until the time Anson discovered Swenson's telephone had been disconnected, the circuit court determined that Anson should have realized that Swenson was no longer in business and taken action to preserve her claim.

[¶25.] There is little South Dakota case law on the subject of what constitutes reasonable and good-faith conduct on the part of a plaintiff seeking relief via equitable tolling. *See Dakota Truck Underwriters*, 2004 S.D. 120, ¶ 28, 689 N.W.2d

at 203 (noting three cases in which conduct was examined); *Peterson*, 2000 S.D. 27,

¶ 18, 607 N.W.2d at 14 (examining conduct in two North Dakota cases).  The

majority of the case law from other jurisdictions in this area is in the context of

federal habeas petitions for which the test for equitable tolling is slightly different

because an inmate's incarceration limits options to obtain other representation and

access to his or her attorney.  *See Downs v. McNeil*, 520 F.3d 1311, 1324 (11th Cir.

2008) (citing *Pace v. DiGuglielmo,* 544 U.S. 408, 418, 125 S.Ct. 1807, 1814, 161

L.Ed.2d 669 (2005) (holding "a litigant seeking equitable tolling bears the burden of

establishing two elements:  (1) that he has been pursuing his rights diligently, and

(2) that some extraordinary circumstance stood in his way")); *Lawrence v. Florida,*

549 U.S. 327, 336, 127 S.Ct. 1079, 1085, 166 L.Ed.2d 924 (2007) (same); *Arthur v.*

*Allen,* 452 F.3d 1234, 1252 (11thCir. 2006) (holding "equitable tolling 'may be

applied if the petitioner demonstrates (1) diligence in his efforts to timely file a

habeas petition and (2) extraordinary and unavoidable circumstances'").  The level

of diligence a petitioner must demonstrate to obtain relief under equitable tolling in

a federal habeas proceeding is to make reasonable efforts.  *Id.*

[¶26.]        As noted by the Eleventh Circuit, "due diligence does not require a

prisoner to undertake repeated exercises in futility or to exhaust every imaginable

option, but rather to make reasonable efforts."  *Id.* at 1323 (quoting *Aron v. United*

*States*, 291 F.3d 708, 712 (11thCir. 2002)).  The standard also takes into account the

limitations imposed by "'the conditions of confinement and the reality of the prison

system.'"  *Id.*  Maintaining contact with counsel, repeated and continuous attempts

to follow up with counsel, and providing counsel with materials and suggestions for

drafting a petition qualifies as diligent and reasonable conduct in the context of a federal habeas claim. *Id.* (noting that the habeas petitioner took "prudent, persistent action to remind his lawyers of imminent deadlines and did his best to remain informed of the status of his state court proceedings as they related to his federal limitations period[,]" . . . sent regular letters to counsel, participated in periodic meetings, and requested confirmation that "motions were being drafted and filed in a timely manner"). *See also Martin*, 408 F.3d at 1095 (holding over forty telephone calls to counsel from petitioner and his wife, petitioner's wife attending appointments at counsel's office, and petitioner sending original documents for use in drafting was reasonable and diligent conduct by the petitioner in an effort to timely file habeas petition). We see no reason to expect anything less than the same diligent and reasonable conduct by a litigant who seeks relief in our state court system as that demonstrated by incarcerated federal habeas petitioners.

[¶27.]     In the instant case, Anson had trouble getting Swenson to contact her almost immediately following their initial meeting. Anson made repeated and routine telephone calls to Swenson from March 2005 until August 2007, all of which resulted in Anson speaking to Swenson's secretary or answering machine. She was able to speak with Swenson once on the telephone and to meet with him in person in the fall of 2005 as a result of her persistent efforts. After the fall of 2005 meeting with Swenson, Anson continued making telephone calls and either spoke with his secretary or left a message on the office answering machine, but did not have any personal contact with Swenson.

[¶28.] During this time, Anson did not believe there was a problem with Swenson's practice other than his continued failure to return telephone calls. While Anson believed the complaint had been filed due to her receipt of an unsigned copy of the summons and complaint, she acknowledged she received no other documentation or court filings from Swenson. Swenson's assurances that the case was progressing also helped lull Anson into the belief that her complaint had been filed.

[¶29.] The circuit court concluded that over the course of September 2005 to August 2007, Anson should have begun to suspect Swenson was no longer in business. We agree that Anson should have begun to suspect something was amiss with Swenson's practice, but not necessarily that he was no longer in practice. However, Anson should have at least suspected that her case was not in the hands of a competent attorney or one who was giving her case the attention it required as no new information was ever shared with Anson other than Swenson's 2005 claims that he was in negotiations with opposing counsel. Swenson's inability to return calls, acknowledge the medical bills Anson sent him over the course of the representation, or provide documentation about the negotiations allegedly being pursued should have raised serious doubts about Swenson and caused Anson to make further inquiries with the State Bar or the court listed at the top of the draft complaint she received in March 2005.

[¶30.] Anson's conduct up until August 2007 was not entirely fatal to her request for equitable tolling. However, her conduct in August 2007 after she discovered the statute of limitations had expired, showed that she behaved in a less

than reasonable and diligent manner under the totality of the circumstances. First, Anson failed to take immediate action once she knew Swenson had either moved his office without notifying her or was no longer in the Sioux Falls area. Waiting three months before taking any action after learning Swenson was no longer practicing law in the Sioux Falls area does not satisfy the reasonable and good-faith conduct standard. Anson should have realized her case had been abandoned by Swenson and was at risk as a consequence and taken immediate action instead of taking no action at all. Instead of taking immediate action by either calling the State Bar, the Zahrbocks, or using a Sioux Falls telephone directory or the internet to locate another attorney from her work site in Colorado, Anson made the conscious decision to do nothing until she returned. Anson, unlike a federal habeas prisoner, was not limited in her ability to make telephone calls or retain new counsel while in Colorado.

[¶31.] Finally, Anson's delay in filing a motion to amend the petition to include her as a plaintiff does not weigh in favor applying the doctrine of equitable estoppel. Anson's first motion to the circuit court to amend Zahrbocks' complaint to add Anson as a plaintiff was not filed until May 22, 2008. There is no explanation in the record for this additional delay from January 2008 to May 22, 2008. By this time, Star Brite was lulled into believing that there was no longer a risk of additional litigation from Anson for the events of December 23, 2004.

[¶32.] Based on Anson's conduct from the fall of 2005 until May 22, 2008, her conduct does not rise to the level necessary for the factual application of the doctrine of equitable estoppel. Anson relied exclusively on Swenson's

representations despite his obvious inability to return telephone calls and keep her informed. Once she determined that Swenson was no longer representing her adequately, Anson did not move to protect her rights with the circuit court until May 22, 2008, almost five months after the statute of limitations had expired.

[¶33.] Affirmed.

[¶34.] ZINTER and SEVERSON, Justices, concur.

[¶35.] KONENKAMP and MEIERHENRY, Justices, concur in result.

KONENKAMP, Justice (concurring in result).

[¶36.] I question whether we are authorized to adopt the equitable tolling doctrine for civil actions. Equitable tolling is a common law principle having its genesis in the inherent power of courts to avert grave miscarriages of justice. That power is as old as our nation. In 1870, the United States Supreme Court traced the history of court-declared, nonstatutory exceptions to statutes of limitation back to the Revolutionary War, noting "that the running of a statute of limitation may be suspended by causes not mentioned in the statute itself." *Braun v. Sauerwein*, 10 Wall 218, 77 U.S. 218, 223, 19 L.Ed. 895 (1870).

[¶37.] Yet it is equally well established in both federal and state jurisdictions that legislatures may preclude equitable tolling by expressing an intention "to disallow tolling under any circumstances not enumerated in the statute." *Laird v. Blacker*, 828 P.2d 691, 698 (Cal. 1992); *see also Battuello v. Battuello*, 64 Cal.App.4th 842, 847-48 (1998). Equitable tolling will not apply if it is "inconsistent with the text of the relevant statute." *United States v. Beggerly*, 524 U.S. 38, 48,

118 S.Ct. 1862, 1868, 141 L.Ed.2d 32 (1998) (citation omitted); *see also Lampf, et al. v. Gilbertson*, 501 U.S. 350, 363, 111 S.Ct. 2773, 2782, 115 L.Ed.2d 321 (1991). Such tolling is also not permissible when it contravenes clear legislative policy. *See Abreu v. Svenhard's Swedish Bakery*, 208 Cal.App.3d 1446, 1456 (1989).

[¶38.]     Thus, the question whether equitable tolling is permissible turns not solely on the inherent power of courts, but on what the Legislature intended when it enacted the statute of limitations. In South Dakota, the common law is abrogated when it conflicts with the sovereign power as evidenced by legislative enactments. SDCL 1-1-23(5); SDCL 1-1-24. Do we have express legislation precluding equitable tolling in civil actions? Consider SDCL 15-2-1: "Civil actions can *only* be commenced within the periods prescribed in this title after the cause of action shall have accrued except where in special cases a different limitation is prescribed *by statute*." (Emphasis added.) And the applicable statute of limitations within the same title is SDCL 15-2-14(3): personal injury actions must be "commenced *only* within three years after the cause of action shall have accrued[.]" (Emphasis added.) Whether these two statutes taken together explicitly preclude equitable tolling remains to be resolved. Neither side briefed this point, and the question has not been raised in previous cases. In rejecting equitable tolling in a medical malpractice action, however, we cautioned that courts may fill legislative gaps, but "should not usurp the legislative function" to rewrite statutes of limitations. *Peterson v. Hohm*, 2000 S.D. 27, ¶ 18, 607 N.W.2d 8, 14 (citation omitted).

[¶39.]     In opening the door to the judicial extension of statutory deadlines for bringing civil suits, the circuit court found its primary authority in EEOC and

federal habeas corpus cases. Statutes governing those decisions have nothing to do with South Dakota civil actions. Our first resort must be to our own laws, because if the statutes plainly dictate otherwise, equitable tolling is impermissible. *See Beggerly*, 524 U.S. at 48, 118 S.Ct. at 1868, 141 L.Ed.2d 32. Likewise, our decision in *Dakota Truck Underwriters* cannot supply any useful authority here. *See* 2004 S.D. 120, 689 N.W.2d 196. That was not a civil case, but an action to recover under a special statute for partial reimbursement of certain workers' compensation payments. There, we filled a gap in otherwise problematic legislation. Here, the question remains whether there is any gap to fill.

[¶40.] Accordingly, I would go no further than to say that even if the equitable tolling doctrine applies to South Dakota civil actions, it would not apply here for the reasons the Court explains.

[¶41.] MEIERHENRY, Justice, joins this special writing.